149 F.Supp. 681 (1957)
Willis A. HAWKINS, Ralph White, Floyd Smith and George J. Smith, Plaintiffs.
v.
STATE AGRICULTURE STABILIZATION AND CONSERVATION COMMITTEE, Robert G. Shrauner, Chairman, Searcy M. Ferguson, Member, C. W. Danklefs, Member, C. Otto Moser, Member, G. C. Gibson, Director Extension Service and Member, and Gaylor F. Osborn, Member, Defendants.
Civ. A. No. 9270.
United States District Court S. D. Texas, Houston Division.
March 25, 1957.
*682 Fulbright, Crooker, Freeman, Bates & Jaworski (Austin Wilson and Chester Fulton), Houston, Tex., for plaintiffs.
Geo. Stephen Leonard, Acting Asst. Atty. Gen., Donald B. MacGuineas, Atty., Dept. of Justice, Washington, D. C.; Max L. Kane, Atty., Dept. of Justice, Washington, D. C., Howard Rooney, Atty., Dept. of Agriculture, Washington, D. C.; Malcolm R. Wilkey, U. S. Atty., and Sidney Farr, Asst. U. S. Atty., Houston, Tex., for defendants.
INGRAHAM, District Judge.
This is an action for permanent injunction and declaratory judgment, in which plaintiffs complain of the manner in which defendants allocated portions of the state acreage reserve for Texas upland cotton for 1956 to the various counties in Texas. Most of the acreage allotted to the state for 1956 was distributed to counties by means of a uniform formula based on acreage planted in cotton during preceding years. A portion was held back and distributed under a different and more complex pattern. This portion, around which the disagreement centers, is the State reserve. The action having been tried and submitted, the court makes the following findings and conclusions:

Findings of Fact
1. Plaintiffs operated cotton farms in 1956 in the following respective counties in Texas:

Willis A. Hawkins  Castro County
Ralph White  Howard County
Floyd Smith  Martin County
George J. Smith  Jones County

*683 2. Defendants Shrauner, Ferguson, Danklefs, Moser, Gibson and Osborn comprise the State Agricultural Stabilization and Conservation Committee for Texas, hereafter called the Committee. In 1955 the membership of the Committee was the same except that Fred C. Chandler, Sr. was a member then and Searcy M. Ferguson was not. Subsequently, between the time that this action was filed and the time that it was tried, Ferguson replaced Chandler on the Committee. All of these men are farmers and residents of Texas. They are from widely scattered portions of the state and together constitute a reasonably representative cross section of Texas farming interests from a geographical standpoint.
3. On October 14, 1955, the Secretary of Agriculture, hereinafter called Secretary, determined the necessity for a national marketing quota for upland cotton for the year 1956 and fixed it at 10,000,000 bales. He then determined the national acreage allotment for upland cotton for 1956 to be 17,391,304 acres and apportioned to Texas 7,410,893 acres as its share of the national allotment.
4. Early in 1955 the Committee began consideration of the amount and allocation of the 1956 State reserve. Cotton farmers, including plaintiff Hawkins, and other interested individuals and groups appeared before the Committee or sent letters to it regarding this problem. Through personal observation and discussion with farmers, individual committee members informed themselves of the effect of the cotton program within the respective areas in which they farmed. The Committee considered the results of a survey conducted in 1955 to determine among other things the number of renters and sharecroppers, county by county, who were leaving Texas farms because of reduction in cotton allotments. Before adoption of the final plan, the Committee considered other plans, some of which allocated a portion of the State reserve to adjustments for trends in acreage. After consideration of these plans and repeated discussions among themselves, the Committee set up a State reserve of 10 percent of the total state allotment, or 741,089 acres. This reserve they allocated to the following categories in the amounts shown:

 Percent Acres
(a) To adjust computed county acreage allotments for
 counties adversely affected by abnormal conditions
 affecting plantings of cotton ........................ .085 633
(b) To make adjustments in acreage allotments for
 small farms .......................................... 34.418 255,063
(c) To establish 1956 acreage allotments for new cotton
 farms ................................................ 2,689 19,928
(d) To correct inequities in farm allotments and to prevent
 hardships ............................................ 62,808 465,465

5. There was a ten percent State reserve for the 1954 crop. 80.5 percent of this reserve, or 594,256 acres, was allocated for trend adjustments and apportioned to the counties by means of a formula, the general effect of which was to award the acreage to those counties showing a trend toward increased acreage planted in cotton during the years 1951 through 1953. A 10 percent State reserve was also established for the 1955 crop amounting to 761,278 acres, 475,805 acres of which was allocated to counties for trend adjustments by means of another formula, the general effect of which was to award the acreage to those counties showing a trend toward increased acreage planted in cotton during the years 1952 and 1953. The trend for which adjustments were made for 1954 and 1955 is the same trend for which plaintiffs assert that an adjustment should be made for 1956. There has been no upward trend in cotton acreage in Texas since 1953. Substantially all of the increased acreage received as a trend adjustment in 1954 and 1955 was planted in cotton. The resultant additional *684 plantings, besides assisting the benefitted counties in 1954 and 1955, will operate to increase the allotments of these counties in subsequent years, as long as 1954 or 1955 is included in the five (5)-year base period used in allocating the State allotment to the counties. In the light of these considerations and the other pressing needs for the reserve acreage, the Committee allotted nothing from the State reserve for trend adjustments for 1956.
6. The 633 acres of the reserve assigned for adjustments for abnormal conditions affecting plantings were set aside by the Committee to help three counties which had had low plantings in 1953 and 1954 because of abnormal weather and lack of irrigation water.
7. Under the 1955 allotment program 123,434 acres of the State reserve were assigned to counties for use in adjusting allotments for small farms, the phrase used to designate farms with cotton allotments of fifteen acres down. Under the 1954 program 123,239 acres were assigned for the same purpose. Both assignments were made on the basis of experience under the 1950 allotment program. In 1950 and 1954, the primary basis for establishing farm allotments was the so-called cropland percentage method. In 1955 many counties used a newly authorized basis called the history method. The Committee found that problems associated with small farms in 1955 were considerably greater than those in 1950 and 1954, and found further that in 1955 county committees had utilized some of their hardship assignments to increase small farm allotments. After the 1955 allotment work was completed, the State Committee received many complaints from farmers of undue and extreme hardship on the operators of small farms. By means of a sampling process, the Committee determined that it would take approximately 386,710 acres to adjust all old small farms to the highest cotton acreage on such farms in 1953, 1954 or 1955, but not in excess of 15 acres. The Committee also decided that approximately 66.7 percent of this total requirement should be provided out of the State reserve. The assignment to each county was made on the basis of the product of the estimated number of small farms in the county for which 1956 allotments would be established and the acreage per small farm which, from the sample data taken, would be required to meet the above goal in that particular county. In this manner the Committee established an allocation of 255,063 acres for small farm adjustments and apportioned it to the counties on the basis described.
8. Having determined that approximately the same percentage of the State reserve should be allocated to counties for new farm allotments as was allocated for this use in 1954 and 1955, the Committee assigned 19,928 acres to this category.
9. The Committee determined that 465,465 acres of the State reserve should be used to correct inequities in farm allotments and to prevent hardship. It arrived at that figure by giving weight to five different areas of extreme inequity and hardship which it found in the state.
(a) The Committee learned through its hearings and investigations that many operators of farms having preliminary allotments of 15.1 to 25 acres were suffering severe hardship. It found that these farms were predominantly family-operated and also found that many operators of such farms were finding it extremely difficult to stay on their farms. Since cotton was their only cash crop, it became extremely difficult to employ machinery profitably on the small allotments to which they were reduced. The Committee found that a reduction of a few acres on farms in this category produced as a rule greater hardship than proportionate reductions in larger farms. It further found that some inequitable disparities in allotments existed between farms that were brought up to an allotment of 15 acres from the small farm reserve, on the one hand, and farms with an allotment slightly exceeding 15 acres and therefore ineligible to receive relief from the same farm reserve, on the other *685 hand. Based on the above considerations, the Committee placed 134,075 acres in the hardship section of the reserve and determined that it should be proportioned to counties at the rate of 5 acres for each old farm in the county having a preliminary 1956 allotment of 15.1 to 25 acres.
(b) 21,090 acres of the State reserve for 1955 had been used to assist counties in establishing allotments for new cotton farms for 1955. With certain qualifications unnecessary to detail here, the 1956 allotments for individual farms were based on the average annual acreage planted in cotton for the three years 1953, 1954 and 1955. Since these one-year-old farms in 1956 would have only one year of plantings, as compared with three years for most other old farms, the Committee found that without further relief they would have a correspondingly lower allotment for 1956 and, therefore, that they constituted a special category of inequity and hardship. To meet this situation, the Committee set aside 21,090 acres of the hardship reserve and assigned to each county as its part of this segment of the reserve the same number of acres which that county received from the 1955 State reserve for new farms.
(c) From its hearings and investigations the Committee determined that extreme and undue hardships were occurring in counties that did not receive any net benefit from the trend adjustment made in 1954. It determined that these counties received 191,565 acres less allotment than they would have received had no trend adjustment been made. The Committee also found that most of these counties were located in eastern and central Texas, where cotton plantings were not trending upward during the 1951-1953 period, but on the whole were trending downward. It was found by the Committee that in these areas many men and women left their farms and went into defense plants during the Korean War, while many others, although remaining on their farms, became similarly employed. The Committee also found that there was some shift to cattle raising in these sections during this same period. The Committee found that these factors led to a decrease in cotton plantings in these areas at a time when cotton plantings were being increased in areas that later received net benefits from trend adjustments. The Committee found that after the close of the Korean War many of these individuals returned to the farms from defense plants and those that remained on the farm lost their jobs in defense plants. The Committee was also aware of the fact that cattle prices had declined sharply. The Committee determined that the above factors created an unusual need for cotton acreage in these areas in order to prevent hardship to the farmers who were required to return to cotton to gain a livelihood, and that the situation was aggravated by the fact that the shift back to the farm did not become substantial until after cotton planting time in 1953. The Committee further found that many farms in these areas received low allotments in 1954 and 1955 because of scanty planting history brought about as described above in the 1951-1953 period, although prior to that time these farms had had a stable record of cotton plantings from year to year. The Committee found that this situation was made more acute by the large trend adjustments of 1954 and 1955. After observing the effect on the state as a whole, the Committee further decided that 1954 and 1955 trend adjustments had proved to be too large. On the basis of these considerations, the Committee decided to establish a component of the hardship reserve for distribution on the basis of the county's net contribution to the 1954 trend adjustment. This would have amounted to 191,565 acres but was reduced to 184,691 acres in order to keep the reserve within statutory limitations. This acreage went principally to Central and East Texas counties. A large portion of the acreage went into those areas shown by the Department of Agriculture survey to be the area in which the most people were being forced off farms as a result of the effect of the 1955 cotton program.
*686 (d) The Committee determined that counties receiving a sharp drop in allotted acreage in 1956 as compared with 1955 would have increased hardship problems. Accordingly, a fourth component comprising 123,462 acres was added to the hardship portion of the reserve and distributed so that no county in Texas in 1956 would have less than 93 percent of the acreage allotted in 1955. This acreage went primarily to counties receiving substantial trend adjustments in 1954 and 1955, most of which were located in West Texas.
(e) The Committee finally determined that 2,147 acres should be set aside for use in assisting county committees in correcting erroneous allotments, establishing allotments for late farms and for reconstituting farms and correcting inequities not known to the county committees at the time original allotments were determined. Acreage from this portion of the reserve was to be assigned to counties from time to time on the basis of the showing of need.
10. The reserve program for 1956 formulated by the Committee as set out in Findings 5 to 9 was explained and discussed at a meeting of the Policy Staff of Secretary of Agriculture Ezra T. Benson, which he attended on November 17, 1955. The Secretary also discussed the matter with the general counsel of the Department of Agriculture and informally approved the program.
11. True D. Morse as Acting Secretary of Agriculture considered and approved the official Department of Agriculture docket in connection with the program formulated by the Committee for the allotment of upland cotton acreage in Texas for the 1956 crop. This docket was a dossier of relevant communications and background material, including a written statement by the Committee, explaining the allocation of the 1956 State reserve and the reasons motivating this allocation. It also contained a proposed Amendment to the regulations already published relating to the 1956 cotton acreage allotments, which proposed Amendment was signed by the Acting Secretary on December 2, 1955, as Amendment Number 2 to such regulations, and published in the Federal Register on December 6, 1955. This Amendment approved the county allotments for Texas for the 1956 crop of upland cotton established by the Committee and approved the Committee's allocation of the State reserve for 1956.
12. The inequity and hardship acreage from the State reserve was allocated to the counties to be used generally to relieve inequities and hardships under the Act. The State Committee did not attempt to direct the county committees to use this portion of the reserve to relieve any particular hardships or inequities.
13. Cotton Handbook No. 1 was issued by R. B. Bridgforth, Acting Deputy Administrator for Production Adjustment of the Commodity Stabilization Service of the Department of Agriculture, and Cotton Handbook No. 2 was issued by H. L. Manwaring, Deputy Administrator for Production Adjustment of the Commodity Stabilization Service of the Department of Agriculture. These Handbooks were not published in the Federal Register and were not intended by any officials in the Department of Agriculture to have the force or effect of regulations. They were intended only as general guides for the use of personnel in the administration of the cotton program.
14. All plaintiffs are in compliance with the acreage allotments established for their farms for the 1956 crop of cotton. The plaintiff Willis Hawkins of Castro County, who is semi-retired, has five tenants on his farm and operates in an area changing from dry land farming to irrigated farming. Castro County received 5,547 acres from the 1956 State reserve for inequities and hardships. The plaintiff Floyd Smith of Martin County has a full time job as the general manager of a chemical and feed company in Stanton, Texas. Martin County received 1,631 acres from the 1956 State reserve for inequities and hardships. The plaintiff Ralph O. White of Howard *687 County received 9.8 acres on one farm and 20.3 acres on another farm from the state hardship reserve. Howard County received 2,324 acres from the State reserve for hardships and inequities. Jones County, of which plaintiff George J. Smith is a resident, received 1,260 acres from the State reserve for hardships and inequities.
15. There were approximately 206,000 cotton farms in Texas in 1955 and 1956.
16. Judicial notice is taken of the fact that the 1956 cotton crop in Texas has matured, that the 1956 and 1957 farm allotments for upland cotton under the Act have been issued to farms in Texas, and that the planting of the 1957 cotton crop has begun in southern Texas.
17. Setting aside the 1956 State reserve would necessitate a recomputation of all 1956 allotments and many 1957 allotments. This recalculation would be too late to be of any use to anyone for the production of cotton in 1956. The producer would receive no benefit from an increased 1956 farm allotment under this recomputation insofar as future years are concerned, unless the actual cotton acreage on his farm in 1956 was within ten percent of the recalculated 1956 cotton allotment. Under the record it is still speculative whether, upon recomputation of the State reserve, plaintiffs would receive an increased 1956 cotton allotment, and it is further speculative under the above formula whether they would receive any benefits for future years.

Conclusions of Law
1. Determination of the amount and allocation of the State reserve is committed by law to the discretion of the State Committee, subject to final approval or disapproval in the Secretary. The court has no authority to substitute its judgment on these matters for that of the Committee and Secretary[1] and may not decree, fix and allocate the State reserve or order the Committee and Secretary to fix and allocate it in a particular amount and in a specified manner.
2. The determination and allocation of the State reserve is a rule-making function. The investigations and deliberations of the Committee and Secretary, on the basis of which this function is exercised, do not require formal hearings or a formal record.
3. The State reserve may be used for any one or more of the purposes enumerated in the United States Code, Title 7, Section 1344(e). The Committee and Secretary were not required to allocate to trend adjustment any portion of the 1956 State reserve.
4. It is not necessary that an adjustment be made from the State reserve for every trend, but even if it were, the trend adjustments made in 1954 and 1955 would have satisfied such a requirement here and so relieved the Committee and Secretary from any obligation to make a further adjustment for the same trend in 1956.
5. The establishment and allocation of the 1956 State reserve is valid and the product of a fair and reasonable exercise of discretion by the Committee and Secretary.
6. The Cotton Handbooks were not regulations, nor did the officials who issued them have authority to issue regulations. *688 The State reserve for 1956 was not established and allocated in violation of the Handbooks, but assuming that such a conflict did exist, the issuance of Amendment 2 to the federal regulations pertaining to acreage allotments for the 1956 crop of upland cotton waived any such conflicting requirements of the Handbooks and ratified the Committee's action. (20 F.R. 8951).
7. Plaintiffs having failed to prove by a preponderance of the evidence that they have been damaged by the present reserve, or will receive additional acreage if the present reserve is set aside and a new one established, they have failed to prove their right to any relief.
8. Plaintiffs have not shown themselves entitled to the injunction requested and that phase of the action has become moot.
9. Considering the entire record, the court denies all relief sought.
10. Defendants are entitled to judgment dismissing the complaint with costs.
The clerk will notify counsel to draft and submit appropriate judgment.
NOTES
[1] Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 301, 64 S.Ct. 95, 88 L.Ed. 61; Heikkila v. Barber, 345 U.S. 229, 233, 73 S.Ct. 603, 97 L.Ed. 972; Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122; Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195; Haggar Co. v. Helvering, 308 U.S. 389, 394, 60 S. Ct. 337, 84 L.Ed. 340; Hadden v. Merritt, 115 U.S. 25, 27, 5 S.Ct. 1169, 29 L.Ed. 333; Bates & Guild Co. v. Payne, 194 U.S. 106, 108, 24 S.Ct. 595, 48 L. Ed. 894; Adams v. Nagle, 303 U.S. 532, 540, 58 S.Ct. 687, 82 L.Ed. 999; United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15, 47 S.Ct. 1, 71 L.Ed. 131; N. L. R. B. v. Greensboro Coca Cola Bottling Co., 4 Cir., 180 F.2d 840, 845; Lee v. Roseberry, D.C., 94 F.Supp. 324, 327, affirmed 200 F.2d 155; United States v. Stangland, D.C., 137 F.Supp. 539.