In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-2447

MARK MITTELSTADT,

*Plaintiff-Appellant,*

*v.*

SONNY PERDUE, Secretary of Agriculture,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:15-cv-00725-wmc — **William M. Conley**, *Judge.*

ARGUED SEPTEMBER 28, 2018 — DECIDED JANUARY 15, 2019

Before RIPPLE, SYKES, and SCUDDER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Mark Mittelstadt owned a tract of
land in Richland County, Wisconsin, that was enrolled in the
Conservation Reserve Program ("CRP"), administered by the
United States Department of Agriculture ("USDA"), from
1987 to 2006. Participants in the CRP agree to remove environ-
mentally sensitive land from agricultural production in return
for annual rental payments from the USDA. In 2006, the
agency denied Mr. Mittelstadt's application to reenroll his

land in the CRP. After exhausting his administrative appeals, he brought this action against the Secretary of the USDA ("the Secretary"). He asserted one claim under Section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., challenging the Secretary's final decision denying reenrollment, and one common law claim for breach of contract. Mr. Mittelstadt moved for summary judgment in the district court, seeking an order directing reenrollment of his land in the CRP and awarding monetary relief for the alleged breach of contract. The district court denied his motion for summary judgment, affirmed the Secretary's rulings, and entered judgment in favor of the Secretary on Mr. Mittelstadt's APA and breach of contract claims. Mr. Mittelstadt now appeals the district court's decision.

Under the regulations governing the CRP, the USDA has broad discretion to evaluate offers of enrollment in the program on a competitive basis by considering the environmental benefits of a producer's land relative to its costs. Given the agency's wide latitude, we conclude that the Farm Services Agency ("FSA") did not abuse its discretion when it denied reenrollment of Mr. Mittelstadt's land. Moreover, because he never entered a new contract with the agency, there was no breach of contract. We therefore affirm the judgment of the district court.

## I

### A.

In 1988, Mr. Mittelstadt purchased a tract of land in Richland County, Wisconsin ("Tract 9073"), that was subject to a CRP contract for the period 1987 through 1996. To comply with a revised conservation plan, Mr. Mittelstadt planted

white pine, walnut, and red oak trees on the land in 1989. A CRP review later that year determined that Mr. Mittelstadt had completed all items in the conservation plan. Another CRP maintenance inspection in 1995 found no problems with the land. In 1996, the Commodity Credit Corporation ("CCC") extended the existing CRP contract for one year, to run from October 1, 1996, through September 30, 1997.

In 1997, Mr. Mittelstadt applied to reenroll his land in the program, stating on the application that Tract 9073 had a conservation practice of CP11, or "vegetative cover—trees—already established."[1] Relying on the information in his application, the FSA assigned his land an environmental benefits index ("EBI") score of fifty points.[2] This EBI score meant that the conservation practices on the land included "[p]ine established with less than 500 trees per acre with strips of native herbaceous and shrub plantings best suited for wildlife in the area, mixed hardwoods established, or longleaf pine."[3] The FSA approved the new contract ("Contract 653"), to be effective from 1998 to 2007. A 2002 field status review of the property found no violations, noting, "Trees are growing and looking good."[4]

In 2006, Mr. Mittelstadt began the reenrollment process by paying for a spot-check inspection of Tract 9073. The inspection found no violations, noting "62.9 CP11 Tre[es] … already

---

[1] R.16-5 at 2.

[2] The FSA relies on a national EBI to rank offers for enrollment in the CRP based on their estimated environmental benefits and costs. *See* R.16-1 at 679.

[3] R.16-5 at 3.

[4] *Id.*

est" and "good."[5] The Natural Resources Conservation Service ("NRCS") sent Mr. Mittelstadt Contract 1710, a form CRP contract for the term October 1, 2007, to September 30, 2017, which Mr. Mittelstadt signed on July 26, 2006.[6] On August 19, 2006, Mr. Mittelstadt signed a revised version of the contract, amended to reflect the correct acreage of Tract 9073.

In August 2006, the NRCS sent Mr. Mittelstadt a conservation plan for Tract 9073. The plan "identified the conservation practice as CP11, a 'mixed stand (2 species) of hardwoods best suited for wildlife in the area.'"[7] Mr. Mittelstadt signed the plan on August 24, 2006, and, on September 1, 2006, the Richland County Conservation Department approved it. The NRCS signed off on the plan on September 5, 2006, as did the FSA on September 13, 2006.

## B.

On or around September 13, 2006, Jared Reuter, the County Executive Director of the Richland County FSA, signed the amended version of Contract 1710 on behalf of the CCC. Reuter's signature was later whited out,[8] however, and Mr. Mittelstadt never received a countersigned copy of Contract 1710. On September 14 and 16, 2006, Reuter conducted two maintenance inspections of Mr. Mittelstadt's land. By letter dated September 21, 2006, the FSA County Committee

---

[5] *Id.*

[6] The CCC never countersigned the original version of Contract 1710.

[7] R.16-5 at 3.

[8] The Secretary contends that Reuter likely whited out his signature after inspecting Mr. Mittelstadt's property and discovering CRP violations on Tract 9073. Appellee's Br. 8 n.2.

notified Mr. Mittelstadt that the inspections revealed CRP violations on Tract 9073. Aerial photos taken in 2005 showed that three areas of the acreage had "suffered tree loss that the field reporter did not originally report during the re-enrollment compliance check."[9] Reuter also found that very few red oak trees "were present from the original planting," and "[o]ne area with the most red oak present had less than 100 planted red oak trees present."[10] The letter warned that "[v]iolations of this type can result in termination of the acreage involved" and that Mr. Mittelstadt's "re-enrollment/extension offer cannot be approved until this issue is settled."[11]

At a hearing on October 25, 2006, the FSA County Committee discussed the issues raised by the inspections, and the next day, the committee sent Mr. Mittelstadt a letter terminating Contract 653. The committee explained that, in 1997, Mr. Mittelstadt's acreage did not have "a 'mixed hardwood stand of trees (more than one species of hardwood trees)' because of the 'failed population of red oak.'"[12] As a result, the FSA had assigned incorrectly an EBI score of fifty points upon reenrollment of the land in the CRP. Further, to "be eligible to be placed in the CRP," land must qualify under a covered category, such as "[a]creage enrolled in CRP during the final year of the CRP contract." 7 C.F.R. § 1410.6(a). Because Mr. Mittelstadt's land was enrolled improperly under

---

[9] R.16-5 at 3.

[10] R.19 at 103 (Letter from Reuter to Mr. Mittelstadt (Sept. 21, 2006)).

[11] *Id.* at 103–04.

[12] R.16-5 at 4.

Contract 653 in 1997, the committee also found it was not eligible for reenrollment under Contract 1710 in 2006.

Mr. Mittelstadt appealed the County Committee's decision to the Wisconsin State FSA Committee. By letter dated August 13, 2007, the State FSA Committee upheld the County Committee's decision, finding that "[t]here are no areas of the contract that qualify as 'mixed hardwoods.'"[13] The State Committee concluded that "the scoring of the contract offer in 1997 was incorrect," and that the land was "also ineligible for re-enrollment through the re-enrollment and extension process that was conducted in 2006 because the current contract was not in compliance."[14]

## C.

Mr. Mittelstadt sought review from the USDA's National Appeals Division, where the parties stipulated that the sole issue on appeal was the propriety of the eligibility determination with respect to Contract 653 that had been made in 1997. The Hearing Officer upheld the State Committee's decision, but, on further review, the Deputy Director reversed the decision. Because "the preponderance of the evidence show[ed] that the placement of trees on Appellant's land satisfied the 'mixed hardwoods established' requirement for a CP11 practice and warranted the assigned EBI score of fifty points," the Deputy Director ordered the FSA to reinstate Contract 653.[15] However, the Deputy Director found no error with respect to the FSA's denial of reenrollment under Contract 1710. Given

---

[13] R.19 at 38.

[14] *Id.*

[15] R.16-5 at 7.

that Mr. Mittelstadt's land "may not meet new standards such as a new definition of mixed hardwood stand or FSA otherwise may have a legitimate reason for not extending re-enrollment," the decision "was supported by applicable regulations and substantial evidence in the record."[16]

Mr. Mittelstadt sought reconsideration of the Deputy Director's decision, which the FSA Director denied. The Director explained that "agency regulations at 7 C.F.R. § 1410.31(a) provide that acceptance or rejection of any offer of land by an owner for CRP participation shall be in the sole discretion of the CCC and offers may be rejected for any reason as determined to accomplish the goals of the program."[17] According to the Director, "[w]hile not cited in the determination, this regulation was the basis" for the Deputy Director's decision.[18] Thus, "[o]nce FSA concluded that the property no longer had as high an EBI score as it once did, FSA could use that score to decide that funding a continuation of enrollment of the property was not as high a priority as funding other CRP contracts."[19]

## D.

Having exhausted his administrative appeals, Mr. Mittelstadt filed a complaint in the district court. He asserted a claim under the APA, contending that the decision denying

---

[16] *Id.*

[17] R.16-6 at 1.

[18] *Id.*

[19] *Id.*

his application for reenrollment under Contract 1710 was arbitrary, capricious, and unlawful. In the alternative, he set out a common law claim, asserting that the agency breached its obligations under Contract 1710. He later moved for summary judgment on both counts of the complaint.

The district court denied Mr. Mittelstadt's motion for summary judgment and affirmed the agency's final decision. First, the district court rejected Mr. Mittelstadt's contention that the Deputy Director of the National Appeals Division had abused his discretion by upholding the denial of reenrollment under Contract 1710 despite the parties' stipulation that the sole issue on appeal was the propriety of the 1997 eligibility determination. Second, the district court rejected Mr. Mittelstadt's assertion that the USDA had abused its discretion by denying reenrollment of his land in 2007 based on a conservation standard adopted in 2006. Third, the district court dismissed Mr. Mittelstadt's common law claim for breach of contract, determining that no contract existed to support that claim. The district court then entered judgment in favor of the Secretary on Mr. Mittelstadt's APA and breach of contract claims. Mr. Mittelstadt timely sought review of the district court's decision.[20]

---

[20] The district court had jurisdiction over this case under the judicial review provision of the APA, which waives sovereign immunity for actions "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702. For purposes of § 702, the Supreme Court has held that the mere "fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). Instead, the critical question is whether the plaintiff seeks substitute or specific relief. Whereas "[d]amages are given to the

## II

## DISCUSSION

We review the district court's decision on summary judgment de novo. *Stable Invs. P'ship v. Vilsack*, 775 F.3d 910, 915 (7th Cir. 2015). In "an action for review of final action taken by a federal administrative agency, the ultimate question is whether that action is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Id.* (citation omitted) (quoting 5 U.S.C. § 706(2)). To "answer[] that question, we rely on the same administrative record that was

---

plaintiff to *substitute* for a suffered loss," specific remedies "attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895 (quoting *Maryland Dep't of Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985)) (emphasis in original). Here, Mr. Mittelstadt's request for an order directing the Secretary "to pay all amounts due and owing under Contract 1710," R.3 ¶ 152, was not a request for "money damages" because Mr. Mittelstadt sought payments "not as compensation for [the Secretary's] failure to perform some other obligation," but as "the very thing to which he was entitled" under the CRP. *Columbus Reg'l Hosp. v. FEMA*, 708 F.3d 893, 896 (7th Cir. 2013) (quoting *Bowen*, 487 U.S. at 895). Mr. Mittelstadt's APA claim challenging the Secretary's decision denying reenrollment seeks "relief other than money damages," and is "therefore within the waiver of sovereign immunity in section 702." *Maryland Dep't of Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1448 (D.C. Cir. 1985) (quoting 5 U.S.C. § 702). Additionally, because his breach of contract claim is, at base, an alternative request for administrative relief directing the Secretary to make the payments to which Mr. Mittelstadt would have been entitled under Contract 1710, this claim is simply a different way of characterizing his request for "the very thing to which he was entitled" under the CRP. *Columbus Reg'l Hosp.*, 708 F.3d at 896 (quoting *Bowen*, 487 U.S. at 895). Jurisdiction over Mr. Mittelstadt's breach of contract claim was therefore proper under § 702. We have jurisdiction over this appeal from the district court's entry of summary judgment under 28 U.S.C. § 1291.

before the district court and render an independent judgment as to whether the agency acted unreasonably." *Id.* Under this "deferential standard," we "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *St. Clair v. Sec'y of Navy*, 155 F.3d 848, 851 (7th Cir. 1998) (internal quotation marks omitted).

**A.**

We begin with an examination of the governing statutory scheme. As part of the Food Security Act of 1985,[21] Congress established the CRP. This program incentivizes landowners to remove environmentally sensitive land from agricultural production in return for annual rental payments from the USDA. S. Rep. 99-145, at 1971 (1985). The impetus for the development of the CRP was an increased concern about soil erosion. *Id.* In 1982, the National Resources Inventory[22] had determined that almost fifty percent of erosion occurred on only ten percent of cropland in the United States. *Id.* The Soil Conservation Service projected that the CRP would "reduce wind and water erosion on these acres by an average of nearly 20 tons per acre per year." *Id.* (capitalization omitted). Accordingly, Congress directed the Secretary to "formulate and carry out" the CRP by awarding contracts to encourage landowners "to conserve and improve the soil, water, and wildlife resources of such land and to address issues raised by State,

---

[21] Pub. L. No. 99-198, §§ 1201, 1231–1236, 99 Stat. 1354, 1504–05, 1509–14 (codified as amended at 16 U.S.C. §§ 3801, 3831–3836).

[22] Administered by the NRCS, the National Resources Inventory is a "statistically-based survey" designed to "assess conditions and trends of soil, water, and related resources on nonfederal lands in the United States." 7 C.F.R. § 601.1(f)(1)(v).

regional, and national conservation initiatives." 16 U.S.C. § 3831(a).

The USDA oversees the CRP, with funding provided by the CCC, an entity owned and operated by the government. 16 U.S.C. § 3841(a). Together with the FSA, the CCC is responsible for implementing the regulations governing the CRP. 7 C.F.R. § 1410.1(a). The Agricultural Stabilization and Conservation Service, which operates through state and county committees, administers the CRP on behalf of the CCC.

The FSA and the Agricultural Stabilization and Conservation Service also have issued, for use by the state and county committees, handbooks detailing the procedures and requirements for implementing and participating in the CRP. These handbooks, which were not published in the Federal Register and therefore were not promulgated according to the requirements of the APA, are interpretive only and do not have the force or effect of official regulations.[23]

The statute limits the type and total acreage of land that can be enrolled in the CRP. Land eligible for enrollment includes certain highly erodible cropland, marginal pasture land, grasslands, and, at the Secretary's determination, otherwise ineligible cropland that poses an environmental threat. 16 U.S.C. § 3831(b). During fiscal year 2018, the Secretary could maintain no more than twenty-four million acres of land in the program. *Id.* § 3831(d)(1)(E). Additionally, the

---

[23] *See Westcott v. U.S. Dep't of Agric.*, 765 F.2d 121, 122 (8th Cir. 1985) (per curiam); *see also Thomas v. Cty. Office Comm. of Cameron Cty.*, 327 F. Supp. 1244, 1253 (S.D. Tex. 1971); *Graham v. Lawrimore*, 185 F. Supp. 761, 764 (E.D.S.C. 1960); *Hawkins v. State Agric. Stabilization & Conservation Comm.*, 149 F. Supp. 681, 686 (S.D. Tex. 1957).

Secretary cannot enroll more than twenty-five percent of the cropland in any county unless he determines that enrolling a larger percentage "would not adversely affect the local economy." 16 U.S.C. § 3844(f).

Landowners who wish to participate in the CRP must engage in a bid system. According to the legislative history, the statute utilizes this system because "the competitive bid system is the most cost-effective means of identifying our least productive and most erosion prone acreage, while at the same time minimizing cost to the U.S. Treasury." S. Rep. 99-145, at 1971 (capitalization omitted). Congress determines, for a given year, the maximum acreage permitted to be enrolled in the CRP each time it amends the authorizing statute.[24] Individual rental payments are capped at $50,000 per year. 16 U.S.C. § 3834(g)(1).

To participate in the bidding process, landowners submit offers to the CCC indicating "the amounts they are willing to accept as rental payments to enroll their acreage in the CRP." 7 C.F.R. § 1410.31(a). The CCC may evaluate offers "on a competitive basis in which the offers selected will be those where the greatest environmental benefits relative to cost are generated." *Id.* In evaluating offers, the agency employs a national EBI, which "provides a relative ranking of estimated environmental benefits and cost for land offered for CRP."[25] "Acceptance or rejection of any offer" is "in the sole discretion of the CCC[,] and offers may be rejected for any reason as

---

[24] *See* Agriculture Improvement Act of 2018, Pub. L. No. 115-334, § 2201(c) (amending 16 U.S.C. § 3831(d)); Agricultural Act of 2014, Pub. L. No. 113-79, § 2001(d) (same).

[25] R.16-1 at 679.

determined needed to accomplish the goals of CRP." 7 C.F.R. § 1410.31(a). When evaluating contract offers, the CCC may consider such factors as soil erosion, water quality, wildlife benefits, soil productivity, the "[l]ikelihood that enrolled land will remain in non-agriculture use beyond the contract period," air quality, and the cost of enrolling the land in the CRP. *Id.* § 1410.31(b). Offers to enroll in the CRP are "irrevocable for such period as is determined and announced by the Deputy Administrator" of the FSA. 7 C.F.R. § 1410.32(c)(2). If an applicant revokes his offer during the irrevocable period, he may be liable to the CCC for liquidated damages. *Id.*

Following CCC approval, the USDA awards CRP contracts for terms between ten and fifteen years, depending on the type of land involved. 16 U.S.C. § 3831(e)(1).[26] In return for converting their land to less intensive uses, landowners receive annual rental payments. 16 U.S.C. § 3833(a)(2). The amounts of these payments are determined when the landowners submit bids for CRP contracts. 16 U.S.C. § 3834(d)(2)(A)(i).

Participants in the CRP must obtain and implement a conservation plan outlining required conservation practices for the enrolled land. The conservation plan is considered part of the CRP contract, 7 C.F.R. § 1410.20(a)(2), and must be approved by the conservation district in which the land is

---

[26] Specifically, "[c]ontracts with land devoted to hardwood trees, shelterbelts, windbreaks, or wildlife corridors will be for a term of 10 years to 15 years, as requested by the applicant." 7 C.F.R. § 1410.7(a). By contrast, "[o]ther general and continuous signup contracts … will be for a term of 10 to 15 years, as determined by the Deputy Administrator." *Id.* § 1410.7(b). "Grassland signup contracts will be for a term of 15 years." *Id.* § 1410.7(c).

located, 7 C.F.R. §§ 1410.3(b), 1410.22(a). Landowners must "[e]stablish and maintain" the required vegetative cover and the required practices on the enrolled land, and must "take other actions that may be required by CCC to achieve the desired environmental benefits and to maintain the productive capability of the soil throughout the contract period." 7 C.F.R. § 1410.20(a)(6). All conservation plans and revisions to such plans are subject to the approval of the Deputy Administrator of the FSA. 7 C.F.R. § 1410.22(e). Subject to fund availability, the CCC must "[s]hare up to 50 percent of the cost" of establishing conservation practices with CRP participants. 7 C.F.R. § 1410.21(a). Rental payments combined with cost-sharing are designed to assure landowners of a return on the land without having to risk large sums of money to adopt conservation practices.[27]

The CCC retains the authority to modify or terminate an existing CRP contract. Specifically, the CCC can modify a CRP contract if the Deputy Administrator determines that, through no fault of the participant, the "installed practice failed to adequately provide for the desired environmental benefit" or "deteriorated," and that "[a]nother practice will achieve at least the same level of environmental benefit." 7 C.F.R. § 1410.33(b). Additionally, the CCC can terminate a CRP contract before expiration of the term if, among other grounds, "[t]he participant is not in compliance with the terms and conditions of the contract," "[t]he CRP practice fails or is not established after a certain time period," the "contract was approved based on erroneous eligibility determinations," or "[t]he Deputy Administrator determines that such

---

[27] *See* Michael W. Strain, Student Survey, *The Conservation Reserve: A Bold Step Towards the Future*, 31 S.D. L. Rev. 523, 529 (1986).

a termination is needed in the public interest, or is otherwise necessary and appropriate to further the goals of CRP." 7 C.F.R. § 1410.32(f).

This statutory and regulatory scheme places considerable discretion over CRP participation in the hands of the FSA. The implementing regulations afford the agency broad discretion to evaluate offers for enrollment and reenrollment in the program:

> [O]ffers may, to the extent practicable, be evaluated on a competitive basis in which the offers selected will be those where the greatest environmental benefits relative to cost are generated ... . Acceptance or rejection of any offer, however, shall be in the sole discretion of the CCC and offers may be rejected for any reason as determined needed to accomplish the goals of CRP.

7 C.F.R. § 1410.31(a). Although we have had no occasion to describe the scope of discretion under this particular regulation, our cases involving other statutory and regulatory grants of "sole discretion" confirm that this language confers wide latitude upon the relevant actor.[28]

---

[28] *See, e.g., Mahler v. U.S. Forest Serv.*, 128 F.3d 573, 577–78 (7th Cir. 1997) (concluding, where the Rescissions Act of 1995 required the Secretary of Agriculture to prepare an environmental assessment and a biological evaluation "*at the sole discretion* of the Secretary concerned and to the extent that the Secretary concerned considers appropriate and feasible," that "this language clearly authorize[d] the Secretary to permit a shorter period for public comment than that usually required under the Public Participation Law" (emphasis added)).

**B.**

With this statutory and regulatory background in mind, we turn first to Mr. Mittelstadt's contention that the agency abused its discretion because it had not defined "mixed hardwoods" when it considered his application for reenrollment under Contract 653 in 1997 or under Contract 1710 in 2006. We also consider his related argument that the agency's application of a new interpretation of "mixed hardwoods," adopted in 2006, when it denied his request for reenrollment under Contract 1710 was an abuse of discretion.

Here, the Secretary "readily acknowledge[d] that, throughout the entire relevant time period, there was never a published definition of 'mixed hardwoods' in FSA's Handbook, in the regulations, or elsewhere."[29] Nevertheless, to evaluate Mr. Mittelstadt's 2006 application for reenrollment, the agency interpreted "mixed hardwoods" to mean "two species of hardwoods planted together in the same rows."[30] Given the great discretion vested in the Secretary to obtain optimal environmental return for every dollar appropriated for the CRP, the FSA clearly had the capability to tighten the definition of "mixed hardwoods" for new contract periods.[31] The very nature of the program affords the Secretary the authority to change the terms and conditions of participation in

---

[29] Appellee's Br. 35.

[30] R.9 ¶ 70.

[31] *Cf. Paragon Health Network, Inc. v. Thompson*, 251 F.3d 1141, 1147 (7th Cir. 2001) (noting that "Congress is presumed to have delegated the primary power to fill regulatory ambiguities to the agency, and courts owe deference to agency decisions that clarify a regulation regardless of the fact that the agency waited to exercise this power").

order to achieve, given the resources available, the most advantageous result. The USDA's policy, therefore, was to maintain a competitive program that allowed the Secretary to select, based on currently available funding, the best land available to attain the goals of the program. The agency did not have to contract for the same conservation measures at the same price upon each reenrollment.

The Secretary's decision to limit program participation to land with a different pattern of hardwoods, a pattern that he deemed more favorable to the conservation ends of the program, cannot be characterized fairly as the reversal of an agency policy. Because there was no previous specific definition applicable to all future contracts set forth in the regulations or even in the FSA Handbook, the Secretary did not reverse a governing policy.[32] For the same reason, the 2006 requirement cannot be characterized as such "a sudden and unexpected change in agency policy" as to be arbitrary, capricious, or an abuse of discretion.[33] The new requirement is grounded firmly in the governing statutes and regulations and implements the Secretary's decision that such a criterion

---

[32] *Cf. Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1123 (8th Cir. 1999) (holding that, since no prior Forest Service or USDA plans provided a definition of the term "guest" for purposes of motorboat use restrictions, the definition newly provided by the Forest Service to avoid abuses of the motorboat use quota system could not "be considered as reversing a prior agency policy" and was entitled to deference).

[33] *See id.* (observing that "'the mere fact that an agency interpretation contradicts a prior agency position is not fatal,' unless the new position is a sudden and unexpected change in agency policy that can be characterized as arbitrary, capricious, or an abuse of discretion" (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996)).

will ensure that the available government funds are implemented in the most effective manner.[34]

Mr. Mittelstadt conceded that "there were never areas of [his] acreage planted to more than one species of hardwood."[35] He had understood that "the terminology 'mixed hardwoods' mean[t] only 1 hardwood species 'mixed' with pine."[36] Accordingly, in 1989, he planted three sections of trees on his land: (1) walnut and white pine trees, (2) red oak and white pine trees, and (3) solely white pine trees.[37] Pine trees are softwoods, whereas walnut and red oak trees are hardwoods, so that no section he planted had more than one species of hardwood tree mixed with pine. It follows that, by 2006, his acreage did not meet the FSA's new requirement, which required that "there be at least 2 species of hardwoods

---

[34] Mr. Mittelstadt asserts that the FSA was "affirmatively required" to inform him of the new interpretation of "mixed hardwoods" and to "help[] him craft a new plan that would elevate [Tract 9073's] EBI score by changing the arrangement of hardwood species." Appellant's Br. 32. He relies on the FSA Handbook, which states that the "FSA will review EBI scoring parameters with the producers and encourage the planting of cover types and conservation measures, if appropriate, that will provide higher environmental benefits." R.16-1 at 679. However, the agency did not discover that Mr. Mittelstadt's land did not meet the new requirement for "mixed hardwoods" until he began the reenrollment process, at which point the maintenance inspections revealed CRP violations. The agency informed him that, to reenroll his land, he could cure the violations by planting two or more species of hardwood trees mixed with a softwood tree. The FSA Handbook, which does not confer a legal right on Mr. Mittelstadt to participate in the program, did not require more.

[35] R.19 at 36–37.

[36] *Id.* at 37.

[37] *Id.* at 28.

mixed into the rows of hardwoods."[38] The FSA therefore did not abuse its discretion when it determined that Mr. Mittelstadt's land did not satisfy the 2006 requirement of "mixed hardwoods."[39]

## C.

---

[38] *Id.* at 37. Relatedly, Mr. Mittelstadt submits that it was error for the FSA not to recalculate the EBI score for Tract 9073 using its new interpretation of "mixed hardwoods." At multiple stages of the review process, however, the agency concluded that there were "no areas of the contract that qualify as 'mixed hardwoods'" under the 2006 requirement. R.19 at 38; *see also* R.16-4 at 5. Nor does Mr. Mittelstadt contend that he engaged in other conservation practices that would contribute to Tract 9073's EBI score. Accordingly, no formal recalculation was needed to conclude that, under the new interpretation, Tract 9073 "no longer had as high an EBI score as it once did." R.16-6 at 1. The FSA's failure to formally recalculate the EBI score for Tract 9073 was not an abuse of discretion.

[39] Mr. Mittelstadt's claim that complying with the FSA's new interpretation of "mixed hardwoods" would have brought him in violation of the existing conservation plan under either Contract 653 or Contract 1710 is unsubstantiated. The 1997 conservation plan for Contract 653 instructed:

> CRP-CP11. The existing tree planting will not be managed for Christmas trees and will be protected from fire and from grazing by domestic livestock for the duration of the CRP contract.

R.19-2 at 13. Similarly, the 2006 conservation plan for Contract 1710 stated:

> CRP-CP11. Vegetative Cover, Trees Already Established. … The existing tree planting will not be managed for Christmas trees and will be protected from fire and from grazing by livestock for the duration of the CRP contract. Spot treat for weed and brush control … .

R.19-1 at 39. Nothing in either conservation plan suggests that Mr. Mittelstadt would have violated those terms by planting "two species of hardwoods … together in the same rows." R.9 ¶ 70.

We turn next to Mr. Mittelstadt's contention that the FSA erroneously relied on 7 C.F.R. § 1410.31(a) to uphold the CCC's denial of reenrollment under Contract 1710. According to Mr. Mittelstadt, this provision "has nothing to do with the post-award process through which Tract 9073 was disqualified from Contract 1710," and "instead describes the pre-award process" through which Contract 1710 was awarded.[40] We cannot accept this argument because it is premised on a nonexistent temporal distinction.

The FSA Handbook instructs that, "[w]hen the producer is ready to submit an offer, County Offices shall provide … to the producer" Form CRP-1.[41] Once a producer submits an

---

[40] Appellant's Br. 35–36.

[41] R.16-1 at 179. As an alternative theory of recovery, Mr. Mittelstadt asserts that, when the agency sent him Form CRP-1 for Contract 1710, it had accepted his offer of reenrollment, and there was a binding contract. But that argument ignores the FSA's express description of Form CRP-1 as a form document that constitutes the producer's "offer" of enrollment in the CRP, not the agency's acceptance of that offer. Further, the FSA Handbook states that "[p]roducers withdrawing CRP-1 during the irrevocable period shall be subject to liquidated damages," *id.*, and Form CRP-1 reiterates that, by signing the form, the participant "agrees to pay such liquidated damages … if the Participant withdraws prior to CCC acceptance or rejection." R.19-1 at 45. These provisions confirm that Form CRP-1 constitutes an offer to be considered by the CCC, not a binding contract. Given that the regulations similarly require that a producer pay liquidated damages to the CCC if he "revokes an *offer* during the period in which the *offer* is irrevocable," 7 C.F.R. § 1410.32(c)(2) (emphases added), the prospect of having to pay liquidated damages provides no support to Mr. Mittelstadt's position that a binding contract existed. Finally, the FSA Handbook requires that Form CRP-1 "be signed and dated by all required signatories," R.16-2 at 183, but Mr. Mittelstadt never received a countersigned

offer on Form CRP-1, the FSA County Committee "shall submit all offers … to the national level for review and evaluation."[42] The regulation at issue, 7 C.F.R. § 1410.31(a), confers "sole discretion" upon the CCC to evaluate offers of enrollment in the CRP "on a competitive basis in which the offers selected will be those where the greatest environmental benefits relative to cost are generated." The regulations further provide that, "[i]n order to be eligible to be placed in the CRP, land must" qualify under an enumerated eligibility category, such as "[a]creage enrolled in CRP during the final year of the CRP contract." 7 C.F.R. § 1410.6(a).

In 2006, when the FSA County Committee concluded that the 1997 eligibility determination had been incorrect and terminated Contract 653, Tract 9073 no longer qualified as eligible "[a]creage enrolled in CRP." *Id.* However, when the Deputy Director of the National Appeals Division reversed that determination and reinstated Contract 653, the effect of his order was only to reinstate Tract 9073's ground for eligibility under 7 C.F.R. § 1410.6(a)(3).[43] Mr. Mittelstadt's bid to

---

copy of Contract 1710. Because there was no binding contract, Mr. Mittelstadt cannot state a claim for breach.

[42] R.16-1 at 185 (emphasis omitted).

[43] Mr. Mittelstadt further contends that the Deputy Director's ruling on the reenrollment of Contract 1710 was improper because, at the pre-hearing before the Hearing Officer, "the parties stipulated that the sole issue on appeal was the erroneous eligibility determination that was made in 1997." R.16-5 at 4. The Hearing Officer found that the "FSA correctly determined that Appellant did not establish a mixed stand of hardwood trees on the contract acreage" and that "Appellant based his request for CRP reenrollment under contract 1710 on the same inaccurate EBI scoring used in CRP contract 653." R.16-4 at 5–6. Accordingly, the Hearing Officer determined both that "FSA correctly terminated contract 653 because of

reenroll was still subject to the CCC's discretion to evaluate his offer based on its relative competitiveness, *see* 7 C.F.R. § 1410.31(a), and actual reenrollment required CCC approval. The FSA Director recognized precisely this degree of discretion when he denied Mr. Mittelstadt's request for reconsideration, explaining that "agency regulations at 7 C.F.R. § 1410.31(a) provide that acceptance or rejection of any offer of land by an owner for CRP participation shall be in the sole discretion of the CCC and offers may be rejected for any reason as determined to accomplish the goals of the program."[44] According to the Director, "[w]hile not cited in the determination, this regulation was the basis" for the Deputy Director's decision.[45] It was no abuse of discretion for the FSA to rely on 7 C.F.R. § 1410.31(a) to uphold the CCC's decision.

Relatedly, Mr. Mittelstadt claims that the agency was first required to change his conservation plan to comply with its new interpretation of "mixed hardwoods" and that, if he "refused to conform Tract 9073 to the corrected Conservation

---

an inaccurate EBI score" and that FSA "correctly denied Appellant's reenrollment request under CRP contract 1710." *Id.* at 6. Thus, the Deputy Director's review of the Hearing Officer's decision necessarily encompassed both the Hearing Officer's findings with regard to the termination of Contract 653 and the reenrollment under Contract 1710, which were "based" on "the same inaccurate EBI scor[e]." *Id.* The district court correctly concluded that "the parties' stipulation … ma[de] little practical sense on its face," R.25 at 18, given that the Deputy Director could not properly review the Hearing Officer's decision without considering the grounds for that decision in full.

[44] R.16-6 at 1.

[45] *Id.*

Plan, the Tract would *then* be in violation."[46] But Mr. Mittelstadt confuses the order of procedure required. The FSA Handbook instructs that, "[i]f [an] offer is determined acceptable," then "a conservation plan must be developed by NRCS … and approved by the Conservation District before CRP-1 can be approved" by the FSA County Committee.[47] Because the FSA never accepted Mr. Mittelstadt's offer to reenroll his land, the agency was under no obligation to develop a new conservation plan for Tract 9073 before denying reenrollment. The FSA's course of proceeding simply was not an abuse of discretion.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

---

[46] Appellant's Br. 49 (emphasis in original).

[47] R.16-1 at 186.